IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HEATHER E. DAVIS, | § | |
|     Plaintiff | § | C.A. No. 4:13-cv-3080 |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| CENTERPOINT ENERGY, INC. | § | JURY TRIAL DEMANDED |
|     Defendant | § | |

### PLAINTIFF HEATHER E. DAVIS' FIRST AMENDED COMPLAINT

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiff Heather E. Davis now files this First Amended Complaint[1] against Defendant CenterPoint Energy, Inc., and alleges as follows:

#### PARTIES

1. Plaintiff, Heather E. Davis ("Plaintiff"), is an individual residing in Brazoria County, Texas.

2. Defendant, CenterPoint Energy, Inc. ("Centerpoint"), is a Texas corporation with its principal place of business in Texas. Centerpoint has already been served with process and has appeared in this case.

#### JURISDICTION

3. The Court has subject-matter jurisdiction over Plaintiff's claims because they arise under federal law and/or are within this Court's supplemental jurisdiction. 28 U.S.C. §§ 1331 and 1367.

#### VENUE

4. Venue is proper in the Southern District of Texas because all or part of this suit

---

[1] This motion has been filed within 21 days after service of Defendant's Partial Motion to Dismiss Under Rule 12(b)(6) (Docket Entry No. 7). Plaintiff is therefore entitled to amend her original Complaint and file this instrument as a matter of course. Fed. R. Civ. P. 15(a)(1)(B).

arose within the Southern District of Texas.

## FACTS

5.  Heather E. Davis is an employee of Centerpoint, and has been since April of 2009.

6.  Resulting from a long-undiagnosed medical condition, and following numerous surgeries, Davis lost most of her sight in or around 2011. She is now legally blind.

7.  After taking a medical leave of absence associated with her disability, Davis was cleared to return to work, with accommodations, effective January 1, 2012.

8.  Beginning in October 2011, Davis repeatedly communicated with her immediate supervisor, Nicole Gilcrease, and the Director of Human Resources, Don Mathews, about her need for accommodations upon her return to work. She provided Gilcrease and Mathews contact information for the State of Texas' Disability and Rehabilitative Services Division for Blind Services (also known as DARS), along with information about other resources available to accommodate Davis' vision impairments.

9.  No one at Centerpoint, though, even bothered to contact DARS until January 2012, after the date Davis had been cleared by her doctor to return to work.

10.  Because of these delays, and notwithstanding the fact that Davis was cleared to return to work on January 1, 2012, Centerpoint did not allow Davis to return until March 15, 2012. Even though Centerpoint would not let Davis return to work as scheduled, it would not pay her full salary during the time that she continued to be out. Mathews also complained to Davis that he was going to need a doctor's release before he would even speak to DARS. So instead of returning to work when she was actually able to do so, Davis had no choice but remain at her home on disability leave while she waited for Centerpoint to accommodate her.

11. Davis notified Gilcrease in December 2011 that she was applying for a service dog from The Seeing Eye, one of the premier providers of seeing-eye dogs in the United States. In or around early March 2012, Davis was advised by The Seeing Eye that she had been selected to receive a service animal. Davis notified Centerpoint immediately that she had been accepted by The Seeing Eye and that she would be taking vacation and holiday time off to attend training with her service dog in June 2012. On short notice, though, Davis was advised that there was an opening and a dog available in May 2012. Davis therefore traveled to New Jersey on or about May 7, 2012, to receive her dog, Fern, and to be trained. This training lasted until her return to Houston on May 31, 2012.

12. On May 29, before Davis returned to work, Gilcrease sent Davis a letter complaining that "[i]t has become clear . . . on the issue of adding a service animal to the list of accommodations, that the service dog is not being acquired by you to perform tasks in the workplace or to help you complete the functions of your job." This hostility, along with the other contents of the letter, was a harbinger of what was to come.

13. Gilcrease and Mathews asked Davis to meet with them before she returned to work with Fern.

14. The meeting occurred on June 1, 2012. At the meeting, Gilcrease and Mathews told Davis that she and her service dog would not be permitted to use the public elevators at Centerpoint's headquarters in downtown Houston. Instead, she and Fern would be required to use the service elevators – ordinarily used to haul freight and trash – to access her work area on the 41st Floor.

15. Gilcrease and Mathews also told Davis that she would henceforth be restricted to

the 41st floor, thus denying her access to other floors of the CNP Tower, Centerpoint's headquarters and where Plaintiff worked. This restriction barred her, among other things, from the 5th Floor Wellness Center (for which Davis paid membership fees), the 13th Floor Training Center, the 28th Floor Employee Break Area, and floors where organizational town hall meetings were held.

16. Gilcrease and Mathews told Davis that if she needed to go to any other floors for business she could ask another employee, Karen Griggs, to do it for her. If she needed to attend a meeting on another floor, she would have to telecommute because Fern would not be permitted to guide her to and from the meetings.

17. Gilcrease and Mathews also told Davis that she could no longer continue with her regular work schedule of four ten-hour days a week in the office. Instead, she would be permitted to work in Centerpoint's offices only one day a week, on Wednesdays. If for some reason she needed to come to the office on another day of the week she would be required to clear it with Gilcrease first.

18. Mathews told Davis that these requirements were being imposed because Centerpoint's management wanted to minimize the impact of Fern in the workplace and on the company's "culture".

19. Ironically, after the adaptive software to be used by Davis was installed on her work computer, a DARS subcontractor named Sharon Ewing came to Centerpoint's office to provide training and to troubleshoot software and hardware challenges related to Davis' job functions. Ewing is also visually impaired and she was accompanied by her seeing-eye dog, Ginger. But Ewing and Ginger were not forced to ride in a service elevator, and nor was her access to

Centerpoint's offices restricted in any way.

20. Following the aforementioned June 1 meeting, Plaintiff was in fact required to work three days a week from her home in Brazoria County, Texas.

21. Davis filed a charge of discrimination with the United States Equal Employment Opportunity Commission and the Civil Rights Division of the Texas Workforce Commission on June 4, 2012.

22. On September 28, 2012, the EEOC issued a Determination finding sufficient evidence to establish disability discrimination against Davis. A copy of the Determination (redacted in compliance with the Court's General Orders) is attached hereto as Exhibit 1, and is incorporated by reference.

23. By this time, though, Centerpoint had already commenced retaliating against Davis by denying her applications for other jobs within the company.

24. For example, on August 15, 2012, Davis applied for the position of Investor Relations Manager. At the time she applied, the position description stated that the job required a minimum of five years of industry experience with at least three years of exposure to or knowledge of Centerpoint's financial and accounting activities. The position was slated to report to Carla Kneipp, Vice President of Investor Relations. Davis was one of only a few Centerpoint employees who met the qualifications for this position.

25. Davis made numerous inquiries of HR about the status of her application. Then, on September 5, 2012, Davis was informed by HR that the Investor Relations department was having "organizational changes" and the Investor Relations Manager job was being reposted. After it was reposted the job still required five years of industry experience but it had been watered

won to require just one year (instead of three) of exposure to or knowledge of Centerpoint's financial and accounting activities. This was quite ironic since the position of Investor Relations Manager inherently required more, not less, exposure to or knowledge of Centerpoint's finances and accounting. Other than watering down the position requirements, the position was the same.

26. Davis nonetheless applied for this position. She was interviewed on September 13. One of the interviewers was Carol Wilson, Senior Director of Human Resources and the immediate supervisor of Don Mathews.

27. On September 27, 2012, Davis was informed via voice mail that she had not been selected for the Investor Relations Manager position. When she later inquired about why she had not been given the job, Davis was told that she lacked certain experience found nowhere in the position description, and that no person outside the company could possibly have had.

28. The position went to Robert McRae, someone who had less education than Davis and certainly less relevant experience. He lacked the requirements for the job as set forth in the original job posting, and he could not possibly have had the Centerpoint-specific experience Davis was told she lacked when she asked why she had not been given the job.

29. On July 18, 2012, Plaintiff applied for a Human Resources Generalist position, for which Plaintiff had relevant experience and education exceeding the posted job requirements. But, she was told on August 13 that she would not even be considered for it.

30. She also applied for an Instructional Designer position on July 18, 2012. Davis had experience and education exceeding the requirements for the position. Yet, she was told more than a month later that she would not even be considered.

31. Since filing her original EEOC charge Davis has applied for more than a dozen

different positions at Centerpoint for which she was highly qualified and she has been rejected for each of them. In many cases, all she was told was that she would not even be considered.

32. The retaliation was not just restricted to her applications for positions within the company. In June 2012, Davis asked Gilcrease for permission to attend Leadership Development training, in the hopes that it would improve her chances for promotion. Gilcrease refused to let Davis attend the training on grounds that she had missed too much work since October of 2011. Yet, the vast majority of these absences were because Davis had been on approved disability leave, because Gilcrease and Centerpoint's failure to put accommodations in place caused her to be out of work longer than necessary, and because she then qualified for and went to go get (and be trained with) a service dog. Gilcrease told Davis explicitly that attending training was not appropriate at the time based, among other things, upon her having taken FMLA leave in connection with her serious health condition. Gilcrease thus penalized Davis because of her disability and because of her having taken disability-related (and FMLA-covered) leave. Notably, every other employee in Davis' department was permitted to take the Leadership course specific to Finance during 2012; Davis was the only employee denied permission.

33. Davis was also denied the opportunity for time off to attend a professional development conference which she was already budgeted to attend. Gilcrease likewise denied Davis support in her work, and would instead impose unreasonable time deadlines on tasks. On other occasions Gilcrease would refuse to transmit information to Davis electronically (so that she could use her adaptive software to access it), which would instead require Davis – a blind woman – to somehow find the printed information (which she could not readily read) buried in binders stored in a locked office.

## FIRST CAUSE OF ACTION
## DISABILITY DISCRIMINATION

34. Plaintiff incorporates all of the allegation set forth above as if fully set forth herein.

35. Davis is disabled, as that term is defined by the Americans with Disabilities Act, as amended, and by the Texas Commission on Human Rights Act, as amended.

36. Plaintiff is a qualified individual with a disability.

37. Defendant discriminated against Plaintiff because of her disability by, among other things, failing to have accommodations in place in time for Plaintiff to return to work in January of 2012, by failing to pay Plaintiff's full salary while she remained out of work due to Defendant's failure to have accommodations in place, by changing her job and essentially turning her into a second class citizen after she received her seeing eye dog, by segregating her within the office and limiting her mobility within Defendant's offices, and by denying her applications for various promotions and other work opportunities within the company.

38. Defendant has also failed to make reasonable accommodation for Plaintiff's disability by, among other things, the aforementioned failure to have accommodations in place in time for Plaintiff to return to work in January 2012, Gilcrease's refusal of Davis' to use only blue or black ink when writing on work-related documents (because, with the limited sight still available to her and/or assistive technology, Davis can only see those colors), Gilcrease's refusal to provide certain assistance at Davis' request, and to transmit certain work-related documents in electronic form (choosing instead to require Davis, a blind person, to go physically find the needed information in a locked room filled with binders of written materials that could easily have been transmitted to her electronically).

39. Plaintiff has been damaged as a result of Defendant's discriminatory acts in

violation of the ADA and TCHRA.

40. Defendant acted with malice or with reckless disregard for Plaintiff's statutorily-protected rights. An award of exemplary damages is therefore warranted.

## SECOND CAUSE OF ACTION (FMLA INTERFERENCE AND RETALIATION)

41. Plaintiff incorporates all of the allegations set forth above as if fully set forth herein.

42. Plaintiff was an "eligible employee" of Centerpoint within the meaning of the Family & Medical Leave Act at the time that she first went out on medical leave on or about October 6, 2011.

43. Centerpoint was Plaintiff's employer, as that term is defined by the FMLA.

44. Plaintiff's leave of absence for surgery and recuperation in the fall of 2011 was covered by the FMLA.

45. Davis had numerous conversations with Mathews in the fall of 2011 regarding her eventual return to work. She repeatedly encouraged Mathews to contact the Texas Department of Assistive and Rehabilitative Services (DARS) to arrange for adaptive software and other accommodations to be set up. Matthews substantially delayed contacting DARS and told Davis that she should just continue to stay out on disability leave. He also told her that he would not even contact DARS unless he first had a doctor's release from her. From this conduct, Davis concluded that Centerpoint did not really want her to return from her FMLA-covered disability leave. Davis therefore resolved that once she did return she would not thereafter request any time off under the FMLA.

46. So, when Davis was informed by The Seeing Eye that it had a dog for her, Davis decided not to request the time off under the FMLA and instead simply took personal and vacation

time to travel to New Jersey to receive and be trained with her new dog.

47. Later, in June 2012, Davis asked Gilcrease for permission to attend Facilitative Leadership training (also known as Leadership Development training), in the hopes that it would improve her chances for promotion. This training course was actually a job requirement for all employees in the Finance group in which Davis worked. But, Gilcrease refused to let Davis attend the training on grounds that she had missed too much work since October of 2011. Gilcrease expressly told Davis that attending this training was not appropriate at the time based, among other things, upon her having taken FMLA leave in connection with her serious health condition. Gilcrease thus penalized Davis because of her disability and because of her having taken disability-related (and FMLA-covered) leave. Every other employee in the Finance department was permitted to take the Facilitative Leadership course specific to Finance during 2012; Davis was the only employee denied permission. Because of this denial of permission, which was explained by reference to her prior FMLA leave, Davis further resolved to avoid requesting time off under the FMLA.

48. So, even though plaintiff has serious health conditions in the form of both diabetes and blindness – both of which require regular visits with her physicians – Davis has continued to avoid the possibility of further incurring management's wrath and reprisal for using FMLA leave by scheduling those appointments to occur only on her scheduled days off. She did this even though she is entitled under the FMLA to take protected leave on scheduled work days to go see her physicians in connection with her serious health conditions.

49. By way of further example, Davis has been advised by her physician that she has developed a cataract that needs to be surgically removed. The surgery and recover would take 10-

14 days off of work.  Because of management's communication of disapproval about her having taken FMLA leave in the past, Davis has held off scheduling this surgery because it would require her to take FMLA leave again.

50. Centerpoint also retaliated against plaintiff in violation of the FMLA.  For example, in 2011 Centerpoint budgeted funds for Davis to attend a professional development conference in 2012.  When it came time for Davis to make arrangements to attend the conference, however, Gilcrease denied her permission to go. As with the in-house Facilitative Leadership class, Gilcrease tied this denial to the fact that Davis had missed so much work in the preceding year.  Again, virtually all of Davis' absences were covered by the FMLA and/or were because of Centerpoint's failure, in violation of the FMLA, to promptly reinstate her to her job when she was ready to return in January 2012.

51. In the case of the professional development conference, this was an opportunity that would contribute significantly to Davis' professional advancement. Specifically, having the ability to use these budgeted funds for continuing education of her own choosing was a substantial benefit that permitted Centerpoint employees to improve their education, improve their job performance, and to better enable them to be promoted or to move into other positions on the career ladder at Centerpoint.  In Davis' case, she was going to attend a conference regarding the latest developments in employee benefits-related accounting, something that was directly relevant to the job that she was performing at the time.  Had she actually taken this course she would have improved her skills and her job performance and therefore made herself a more attractive candidate for promotion within Finance, or for many of the other positions outside of Finance that she has applied for but been rejected from.

52. As with the Facilitative Leadership course, Davis was the only person in her department who was denied permission to use the already-budgeted funds to attend an off-site conference. In other words, all of her colleagues were given an opportunity to advance their professional knowledge and careers at Centerpoint's expense, but Davis was the only one denied the time and funds to do so. Within her own personal context, and especially given the ongoing discrimination and hostility that she was experiencing already from Gilcrease and Mathews, the denial of permission to attend the Facilitative Leadership training and professional development conference were both actions that would deter a reasonable employee in Davis' circumstances from complaining about discrimination or exercising rights under the FMLA. Furthermore, Centerpoint denied Davis permission to attend both of these training opportunities because she had previously taken FMLA leave.

53. Finally, Centerpoint violated the FMLA when it failed to promptly and timely reinstate her to the same or equivalent position when she was ready to return to work on January 1, 2012. Centerpoint's refusal to permit her to return to work – and forcing her to remain on disability leave – constituted an adverse employment action because, among other reasons, Davis' disability insurance covered only some, but not all, of her compensation. Because there was no reason to refuse to let her come back to work, Davis suffered continuing financial losses until Centerpoint finally permitted her return in March of 2012.

54. The FMLA makes it unlawful to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the FMLA.

55. This provision is broadly interpreted as barring any action by an employer to punish an employee for taking FMLA leave, the reason being that such punishment cannot help but

interfere with or restrain the employee from taking such leave in the future.

56. Centerpoint's discriminatory and retaliatory actions against Davis occurred because of Davis' exercise of rights provided under the FMLA.

57. Centerpoint has both interfered with Davis' enjoyment of rights provided under the FMLA, and has retaliated against her in violation of the FMLA.

58. Davis has been damaged as a result of such unlawful interference.

59. Accordingly, Davis now sues for all remedies – including injunctive relief and liquidated damages – that are available under 29 U.S.C. § 2617(a).

### THIRD CAUSE OF ACTION (ADA AND TCHRA RETALIATION)

60. Plaintiff incorporates all of the allegation set forth above as if fully set forth herein.

61. Davis engaged in conduct that is protected under the Americans with Disabilities Act and the Texas Commission on Human Rights Act.

62. Centerpoint has discriminated against Davis because of her protected conduct. Such discrimination included Centerpoint's refusal to hire Davis for the Investor Relations Manager position, its decision to repost the position with watered-down job requirements and then hiring a demonstrably less-qualified person to fill the position, and by refusing even to consider Plaintiff for various other jobs she applied for in 2012 and on into 2013.

63. The retaliation has also included acts committed by Gilcrease for the apparent purpose of making Plaintiff's work life more difficult, including her continued refusal to use blue or black ink at Plaintiff's request (since with her limited remaining eyesight and/or assistive technology she cannot see other colors), her generally negative attitude when Plaintiff has asked for accommodations, as well as her refusal to transmit information to Davis electronically upon

13

her request.

64. Such retaliation violates the Americans with Disabilities Act, as amended, as well as the Texas Commission on Human Rights Act, as amended.

65. Plaintiff has been damaged by Defendant's retaliation.

66. Defendant has retaliated against Davis with malice and/or with reckless disregard for her statutorily protected rights. An award of exemplary damages is therefore warranted.

### FOURTH CAUSE OF ACTION (TEXAS HUMAN RESOURCES CODE)

67. Plaintiff incorporates all of the allegation set forth above as if fully set forth herein.

68. Defendant maintained a fitness center, known as the Wellness Center, in the office building where the Plaintiff worked.

69. The fitness center was a public facility within the meaning of §121.002(5) of the Texas Human Resources Code because it was a public accommodation to which the general public, or any classification of persons from the general public, was regularly, normally or customarily invited. Specifically, membership was available to all Centerpoint employees, their spouses, the employees and spouses of any Centerpoint subsidiaries, as well as all Centerpoint contractors and all tenants working in the CNP Tower, the office building in which Plaintiff works.

70. Section 121.003 of the Texas Human Resources Code makes it illegal to deny persons with disabilities the same right as the able-bodied to the full use and enjoyment of any public facility within the state of Texas. Among other things, this statute prohibits denying a person with a disability admittance to any public facility within the state because of that person's disability, and nor may they deny a person with a disability the use of an assistance animal.

71. Davis is a person with a disability as defined by § 121.002(4) of the Texas Human

Resources Code.

72. Fern, Davis' service dog, is an assistance animal as defined by § 121.002(1) of the Texas Human Resources Code.

73. By denying Plaintiff access to the Wellness Center with her assistance animal, Defendant violated § 121.003 of the Texas Human Resources Code.

74. Plaintiff was damaged as a result of Defendant's violation of the Texas Human Resources Code.

75. Defendant acted with malice, as that term is defined under Texas law. An award of exemplary damages is therefore warranted.

76. Davis now sues pursuant to § 121.004(b) of the Texas Human Resources Code.

## JURY DEMAND

77. Plaintiff demands a trial by jury trial.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

78. Plaintiff timely filed a charge of discrimination with the U.S. EEOC and the Civil Rights Division of the Texas Workforce Commission.

79. Plaintiff timely filed a charge of retaliation with the U.S. EEOC and the Civil Rights Division of the Texas Workforce Commission.

80. Plaintiff originally filed this suit within 90 days of the EEOC's issuance of a Notice of Right to Sue on her charge of discrimination.

81. Plaintiff originally filed this suit within 90 days of the EEOC's issuance of a Notice of Right to Sue on her charge of retaliation.

82. Plaintiff therefore initiated this suit within 90 days of her receipt of each of the two

aforementioned EEOC charges.

83. Additionally, as of the date Davis filed this suit more than 180 days had passed since she filed her charge of discrimination with the Texas Workforce Commission.

84. Likewise, more than 180 days had passed since Davis filed her charge of retaliation with the Texas Workforce Commission.

85. Plaintiff therefore has exhausted her administrative remedies and has a statutory right to sue for disability discrimination and retaliation pursuant to the Texas Commission on Human Rights Act.

## PRAYER

86. Plaintiff accordingly prays that that Plaintiff be awarded a judgment against the Defendants for the following:

   a. Lost wages;
   b. Compensatory damages;
   c. Other pecuniary losses, including but not limited to membership fees paid to Defendant for access to the Wellness Center during the period that Plaintiff was denied access to the facility with her service animal;
   d. Liquidated damages under the FMLA;
   e. Statutory damages under the Texas Human Resources Code;
   f. Exemplary damages;
   g. Equitable relief, including without limitation instatement to the position of Investor Relations Manager (along with a commensurate salary increase and back pay for the time since Plaintiff was denied that position) and an injunction prohibiting Defendant from any further attempts to interfere with her mobility at work with the assistance of her service animal, or further interference with her FMLA rights;
   h. Prejudgment and post-judgment interest;
   i. Court costs, including expert witness fees;
   j. Attorney's fees; and
   k. All other relief to which Plaintiff may be entitled.

Respectfully Submitted,

DOW GOLUB REMELS & BEVERLY, LLP

By: /s/ Andrew S. Golub
    Andrew S. Golub
    State Bar No. 08114950
    Fed. ID No. 13812
    9 Greenway Plaza, Suite 500
    Houston, Texas 77046
    713-526-3700 (Tel)
    713-526-3750 (Fax)

    ATTORNEYS FOR PLAINTIFF,
    HEATHER E. DAVIS

**CERTIFICATE OF SERVICE**

On December 20, 2013, I electronically submitted the foregoing document with the Clerk of the Court of the United States District Court for the Southern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically using the CM/ECF filing system or by any other manner authorized by Federal Rule of Civil Procedure (5)(b)(2):

    Michael J. Muskat
    Gabrielle S. Moses
    Mitchell A. Greene
    Muskat, Martinez & Mahoney, LLP
    1201 Louisiana Street, Suite 850
    Houston, Texas 77002

    */s/ Andrew S. Golub*
    Andrew S. Golub



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Houston District Office

1201 Louisiana Street, 6th Floor
Houston, TX 77002
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Houston Status Line: (866) 408-8075
Houston Direct Dial: (713) 651-4900
TTY (713) 651-4901
FAX (713) 651-4902

460-2012-02573                                        Charge Number

Heather E. Davis                                      Charging Party

CenterPoint Energy                                    Respondent
1111 Louisiana St.
Houston, TX 77002
Attention: Stephen J. Calvert

## DETERMINATION

Under the authority vested in me by the Commission, I issue the following determination as to the merits of the above cited charge.

All requirements for coverage have been met. Respondent is an employer subject to the provisions of the Americans with Disabilities Act of 1990, as amended (ADA). Charging Party alleged that Respondent delayed her reasonable accommodation and subjected her to different terms and conditions of employment because of her disability. Respondent denied discriminating against Charging Party.

Examination of the evidence reveals that in April, 2009, Charging Party began working for Respondent as a Benefits Accounting Analyst. In October, 2011, she notified her supervisor, Nicole Gilcrease, that she would have to take FMLA leave to undergo surgery for her disability. On December 23, 2011, Charging Party's doctor released her to work effective January 1, 2012, but requested that Respondent accommodate her blindness. Respondent contacted the Texas Department of Assistive and Rehabilitative Services (DARS) which ordered, installed, and trained Charging Party on computer hardware and software which provided her with reasonable accommodation. However, the accommodation was not completed until March 15, 2012. Charging Party returned to work at that time, and soon informed Gilcrease that she had been accepted into The Seeing Eye, a guide dog training facility, and would be getting a guide dog.

On May 7, 2012, Charging Party flew to The Seeing Eye's facility in New Jersey after being informed on short notice that there was a guide dog available for her. She underwent training with her new guide dog, Fern, and they returned to Houston on May 31, 2012. Charging Party was asked by Gilcrease and Don Mathews, HR Director, to meet with them before she returned to work with Fern.

## EXHIBIT 1

The investigation showed that on June 1, 2012, when Charging Party met with Gilcrease and Mathews, she was subjected to disability discrimination when she was advised that she could no longer use the public elevators to go to her work area on the 41st Floor of her office building. She and Fern were required to use the service elevators, used to haul freight. Respondent further advised Charging Party that she would have to limit Fern to staying on the 41st Floor, thus effectively denying her access to the other floors of the building which were used by employees at work. These floors included the 5th Floor Wellness Center, the 13th Floor Training Center, the 28th Floor Employee Break Area, and floors where organizational town hall meetings were held. Charging Party was advised that if she needed to go to other floors for business, she could ask another employee, Karen Griggs, to do it. In addition, Charging Party was further advised that she could no longer continue the employee work schedule option of working 4 days in the office. She could only work one day in the office, Wednesdays. She would work at home the other three days, and if she needed to come into the office on days besides Wednesdays, she would have to ask Gilcrease.

Based upon the investigation, the Commission concludes that the evidence establishes violations of the ADA. The evidence establishes that Respondent subjected Charging Party to different terms and conditions of employment because of her disability. No determination is made on any other issue alleged in the charge.

This determination does not conclude the processing of this charge. EEOC will begin conciliation efforts to resolve all matters where there is reason to believe that a violation has occurred. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter.

If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the Director of the Houston District Office is not obtained, the Director will inform the parties and advise them of the court enforcement alternative available to the aggrieved person and the Commission. A Commission representative will contact each party to begin conciliation.

On Behalf of the Commission:

9/28/2012
Date

R. J. Ruff, Jr.
District Director
Houston District Office

Enclosure: Notice of Conciliation Process